# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL BRAGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0159-JTL |
| | ) | |
| BAYSHORE PROPERTY OWNERS | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: December 11, 2020
Date Decided: March 11, 2021

Dean A. Campbell, LAW OFFICE OF DEAN A. CAMPBELL, P.A., Georgetown, Delaware, *Counsel for Plaintiff*.

Stephen A. Spence, BAIRD MANDALAS BROCKSTEDT, LLC, Lewes, Delaware, *Counsel for Defendant*.

**LASTER, V.C.**

Plaintiff Michael Bragdon owns several properties in the Bayshore townhome and condominium development (the "Development"). Defendant Bayshore Property Owners' Association, Inc. (the "Association") is a Delaware member corporation that governs the Development. Bragdon and the other owners of units in the Development are members of the Association.

The Association's authority includes the power to fine owners who violate community rules, including its architectural guidelines. Under those guidelines, satellite dish antennas must be mounted on the fascia. One of Bragdon's tenants ordered satellite television service, and the installer mistakenly placed the dish on the roof. Bragdon promptly noticed the problem and had the dish removed. The mounting bracket remained affixed to the roof.

The Association fined Bragdon for failing to remove the mounting bracket, then hired a contractor to remove it. The Association billed Bragdon for the cost of the contractor. When Bragdon appealed the charges, the Association held a public meeting to consider his appeal and posted the minutes of the meeting on the community website.

Other owners in the community have left mounting brackets on their roofs, and the Association has not taken action against them. When other owners have appealed charges, the Association has not held public meetings to consider the appeals, nor has it posted the minutes on the community website.

Bragdon had filed litigation challenging how the Association conducts its affairs, and he maintains that the Association acted in an arbitrary and capricious manner to retaliate against him. Bragdon filed this lawsuit to invalidate the charges and to have the

minutes removed from the community website. He also sought to recover his expenses, including attorneys' fees and out-of-pocket costs.[1] After discovery and extensive motion practice, the Association mooted the underlying dispute by clearing Bragdon's account of the charges. The Association refused to pay Bragdon's expenses.

Bragdon relies on two sources of legal authority to support his application for expenses. First, he cites Section 81-417 of the Delaware Uniform Common Interest Ownership Act (the "DUCIOA"), which empowers a court to shift expenses "in an appropriate case." Second, he relies on the bad-faith exception to the American Rule.

No Delaware decision has interpreted Section 81-417 the DUCIOA. This decision concludes that Section 81-417 contemplates a lower standard for expense shifting than the bad-faith exception to the American Rule. This decision therefore does not reach the bad-faith exception.

---

[1] This lengthy phrase—"expenses, including attorneys' fees and out-of-pocket costs"—is cumbersome. For brevity, this decision uses the umbrella term "expenses," which is the collective term deployed in Section 145 of the Delaware General Corporation Law (the "DGCL"). *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees) actually and reasonably incurred"); *id.* § 145(c)(1) (mandating that corporations indemnify a director or officer who was successful on the merits or otherwise in defending a proceeding "against expenses (including attorneys' fees) actually and reasonably incurred"). Although this case does not implicate Section 145, the term "expenses" remains a helpful shorthand.

After working through a series of issues of first impression under the DUCIOA, this decision finds that the current dispute is an appropriate case for awarding expenses. Bragdon is entitled to $12,697.84, which is the amount he identified in his opening brief. At this point, Bragdon's expenses necessarily exceed this amount, but an award of $12,697.84 reflects the amount that Bragdon incurred through the point when the Association mooted his claims by granting him all of the relief he sought on the merits. That amount is both reasonable and sufficient on the facts of this case.

## I.    FACTUAL BACKGROUND

The facts are drawn from the affidavits and documents that the parties submitted in support of their cross motions for summary judgment. After the court informed the parties that disputes of fact precluded entry of summary judgment for either side, the parties stipulated to a decision on the merits based on the record submitted with the motions. The record evidence supports the following findings of fact.

### A.    The Development

The Development is a community of townhomes and condominiums located in Millsboro, Delaware. The Development was established in 2003 as a unit property under Delaware's Unit Property Act. Under that act, the governing document for the Development is the Declaration of Covenants, Conditions and Restrictions. Dkt. 4 Ex. A (the "Declaration").

Under the Declaration, the Association exists

[F]or the purpose of maintaining and administering the Common Area; providing common services; administering and enforcing covenants, conditions and restrictions contained [in the Declaration]; adopting and

3

enforcing rules and regulations; and levying, collecting and disbursing the Assessments and other charges provided for [in the Declaration].

*Id.* § 4.1.[2]

The Declaration provides that "[t]he Association shall be governed by a Board of Directors." *Id.* § 4.11. The Declaration states that the Board "shall have the power to perform all rights and duties of the Association unless otherwise specifically reserved to the Association members[] in this Declaration or in the Articles of Incorporation or By-Laws of the Association." *Id.*

The members of the Association comprise the owners of units in the Development. *Id.* § 4.3. The members of the Association have voting rights, including the right to elect members to serve on the Board. *Id.* §§ 4.4, 4.11.

The Association has the power to enforce the rules and regulations that govern the Development. *See id.* §§ 4.1.3, 7.8, 11.1, 11.14. Those rules include a set of architectural guidelines and specifications. *See id.* § 3.3; Dkt. 9 Ex. 2 (the "Architectural Guidelines" or "AG").

As part of its enforcement authority, the Association can impose fines and other charges on property owners. If not timely paid, those amounts bear interest and operate as

---

[2] There is a second association called the Townhomes of Bayshore Condominium Association, Inc. (the "Condo Association"). The Condo Association appears to have taken some of the actions at issue in this case. The parties have not dilated on the relationship between the Association and the Condo Association, nor have they elaborated on the distinction between them. They have treated the two associations interchangeably. This decision follows suit.

a lien on the owner's property. The Association can bring a legal action against the property owner to recover the amounts or foreclose on the lien against the property. The Declaration entitles the Association to recover the costs of collection, including reasonable attorneys' fees. *See* Decl. §§ 7.4, 7.8.

The Association delegates some of its tasks to a property manager. Nonparty Seascape Property Management, Inc. serves as the property manager for the Development.

## B. The Satellite Dish Antenna

Bragdon owns several condominiums in the Development. One of Bragdon's condominiums is located at 25865 Sandpiper Court (the "Condominium").

As an owner, Bragdon is a member of the Association. Bragdon has participated actively in the Association's affairs, and he has challenged actions taken by the Board.

In July 2017, Bragdon filed a lawsuit against the Association and several members of the Board. *See Bragdon v. Bayshore Prop. Owners' Ass'n, Inc.*, C.A. No. 2017-0539-JTL (the "Governance Action"). Bragdon alleged that the Association had failed to comply with its governing documents and Delaware law, and he asked the court to appoint a custodian for the Development. That litigation resulted in the issuance of a preliminary injunction and other relief. The Governance Action remains pending.

In October 2017, a tenant living in the Condominium signed up for satellite television service, which necessitated the installation of a satellite dish antenna. The Architectural Guidelines require that the "dish and its mounting equipment may **ONLY** be attached to the rear fascia board of the town home and **NOT** on the roof." AG at 8 (emphasis in original). The Architectural Guidelines make the property owner "responsible

5

for the cost of repairing any damage to the town home resulting from the dish[,] its installation[,] or removal." *Id.*

On October 10, 2017, Bragdon applied to the Association for permission to install a dish at the Condominium. The Association approved the request, and the Architectural Review Committee issued an approval certificate.

The satellite television company sent an installer to install the dish. After the work was done, Bragdon noticed that the dish was in the wrong location. The installer had mounted the dish on the roof, instead of on the fascia. Bragdon had the installer remove the dish. The mounting bracket, however, remained affixed to the roof.

Shortly thereafter, Bragdon received a letter dated October 16, 2017, from Seascape. It stated,

> We are writing to you today regarding non-compliance of [Architectural Guidelines] at your unit. . . .
>
> Satellite dishes cannot be placed on a townhome roof; per [the Architectural Guidelines] it [sic] can be mounted on the fascia. . . . [A]n ARC application must be submitted prior to any exterior modification; this includes satellite dishes.
>
> You must submit an ARC application for the dish before it is installed. The dish needs to be removed from the roof[,] and the roof must be repaired. Once approved, the satellite dish can be reinstalled onto the fascia board.
>
> Should the dish not be removed within 30 days, the [Association] will take action to do so at the owner's expense.

Compl. Ex. C (the "October Notice").

By the time Bragdon received the October Notice, he already had removed the dish, and only the mounting bracket remained. Bragdon asked Seascape about the notice. Seascape told Bragdon that he had cured the violation by removing the dish.

**C.     The Association Presses The Violation.**

Bragdon maintains that he did not receive any further communications about the dish until January 2018. The Association, by contrast, claims that Seascape sent Bragdon a second notice of violation by letter dated December 11, 2017. That letter allegedly stated,

> We are writing to you regarding a violation letter sent to you on October 16, 2017. Since the satellite dish has not been removed completely and the bracket on your roof is still intact, we have issued a fine in the amount of $100 (invoice included). . . .
>
> Should the bracket not be removed and a letter not be received within 30 days (January 11, 2018), the [Condo Association] will take action to do so at the owner's expense.

Dkt. 53 Ex. E.

Bragdon maintains that he never received the December letter. He first learned of the letter when the Association produced it in discovery. The Association also produced a second letter in discovery, likewise dated December 11, 2017, which purported to impose a "2nd fine" of $100. Dkt. 53 Ex. E. The Association has never produced any prior notice for the second "2nd fine" of $200. *Cf.* Dkt. 53 Ex. G.

Bragdon contends that the two December letters were created later, backdated, and never sent. As support for that contention, he notes that he received an invoice from the Association dated January 1, 2018, which contained only one new charge: $225 for dues to the Association for the Condominium. The invoice did not reference any fines levied in

December. *See* Dkt. 53 Ex. F. Bragdon also points out that the existence of two inconsistent letters, both dated December 11, 2017, makes no sense. The existence of three invoices, all dated January 18, 2018, does not make sense either.

It is undisputed that Seascape sent Bragdon a letter dated January 18, 2018. It stated,

We are writing to you regarding a violation letter sent to you on October 16, 2017 and a fine letter sent December 11, 2017. This is the third attempt to notify you that the satellite dish has not been removed completely[,] and the bracket on your roof is still intact[.] [W]e have issued a second fine in the amount of $100 (invoice included). . . .

As of today, the bracket has not been removed. The [Condo Association] will have the bracket removed at the owner's expense.

Compl. Ex. D (the "January Notice").

In addition to the January Notice, the Association sent Bragdon three invoices, each dated January 18, 2018. The first listed a "new charge" of $50, which it described as a "Fine Assessed by Board for infraction of rules- fine for non-removal of satellite dish bracket." Dkt. 53 Ex. G. The second invoice did not show the $50 charge. It listed a "new charge" of $100, which it described as a "Fine Assessed by Board for infraction of rules- 2nd fine for non-removal of satellite dish bracket." *Id.* The third invoice did not show either the $50 charge or the $100 charge. It listed a "new charge" of $200, which it described as a "Fine Assessed by Board for infraction of rules- 2nd fine for non-removal of satellite dish bracket." *Id.* The Association thus imposed three fines on Bragdon on the same day—two of which were labeled as "2nd fines."

The fines that the Association imposed on Bragdon deviated from the prescribed schedule of fines for architectural violations. Under that schedule, a first violation would

8

result in "a written warning and notice of violation." Dkt. 53 Ex. D ¶ 6(a). A second violation would result in another written warning, plus "a fine in the amount of $50." *Id.* ¶ 6(b). "For a third violation and all others thereafter," the fine increased to $100. *Id.* ¶ 6(c).

The Association next sent Bragdon an invoice dated February 9, 2018. Dkt. 53 Ex. H. It reflected charges of $195 for the costs of "labor and materials to remove [the] satellite bracket and replace shingles." *Id.* A contractor had removed the bracket about a week earlier, on January 31, 2018, less than two weeks after the January Notice. Dkt. 53 Ex. I ¶ 5. According to the invoice, removing the bracket required three hours labor at $60 per hour, plus $15 in materials. Dkt. 53 Ex. H.

The Association had never hired a contractor to remove a mounting bracket. Numerous other residents mounted satellite dishes improperly removed the dishes, and left behind the mounting equipment. At the time of the submissions on the cross motions, eleven other units had mounting equipment on their roofs. The Association did not fine the owners, nor did it hire a contractor to remove the mounting equipment.

**D.     Bragdon Disputes The Charges.**

Bragdon disputed the charges. In February 2018, the Board held a hearing to consider Bragdon's arguments. The meeting minutes described Bragdon's objections as follows:

1.    He is not in violation as after the October letter he removed the DISH from the roof. Therefore he has complied with our letter. He had left the mounting bracket piercing the roof on the roof, but as we did not specifically instruct him in the letter to remove the bracket, he was not in violation.

2.    He did not receive the letter dated and mailed in December.

9

3.     The fines as stated in the letters and on the invoice provided with the January letter had the incorrect amount. For an ARC violation the first fine should be $50 and the Second fine $100. The fines issued were those of the amounts of violations to the Rules of Enjoyment.

Compl. Ex. F. According to the minutes, "[t]he Board did feel that Mr. Bragdon's argument that he had removed the DISH and therefore was in compliance with the warning letter was not persuasive." *Id.* The Board nevertheless instructed Seascape to review the documentation that Bragdon had submitted and make a determination regarding his appeal.

The Association made the minutes of Bragdon's hearing publicly available on the community website. The Association had never posted meeting minutes from appeal hearings with owners. Bragdon characterizes the Association's decision as a form of "public disparagement." Dkt. 53 at 9.

On February 19, 2018, the Board convened again to consider Bragdon's dispute. Seascape reported that the fines were incorrect. The Board determined that "because of the inconsistent information provided in December, the January letter is now considered the first letter/$50 fine." Dkt. 61 Ex. A. A first notice should not have resulted in any fine.

On February 22, 2018, the Association issued a revised invoice which referred to a "2nd fine for non-removal of satellite dish bracket" and lowered the fine from $200 to $100. Compl. Ex. G. The Association thus did not implement the Board's decision. The Association also claimed that on December 11, 2017, it had imposed a fine of $50 fine for "non-ARC application submission," resulting in a total fine of $150. *Id.* The Board had not referenced a prior fine for the failure to submit an application. In fact, Bragdon had submitted an application, which had been approved. The invoice described the $100 fine

as "1-30 days past due" and the $50 fine as "31-60 days past due," and accordingly imposed a "late fee" of $37.46. *Id.*

## E.     This Litigation

On March 8, 2018, Bragdon filed this action. The complaint sought declaratory judgments that "[t]he fine was imposed in violation of [the Development's] governing documents," "[t]he unapproved meeting minutes should be removed from the community website," and "the invoice dated 2/22/2018 [must] be revised to remove the alleged fines." Compl. at 6–7. Bragdon also sought to recover "all costs and attorneys' fees related to this action." *Id.* at 7.

On April 17, 2018, having heard nothing from the Association, Bragdon moved for a default judgment. Dkt. 4. About two weeks later, counsel for the Association appeared for the first time and opposed Bragdon's motion. Dkts. 7, 8. On May 31, the Association answered the complaint. Dkt. 9. In light of those filings, the court declined to enter a default judgment against the Association. *See* Dkt. 10.

On September 27, 2018, Bragdon served interrogatories and requests for production of documents on the Association. Dkt. 11. On October 29, the Association sent the court a letter requesting a litigation stay, citing "duplicative discovery requests" that had resulted from the three actions against the Association pending in this court. Dkt. 13 at 2. Bragdon opposed the Association's request. Dkt. 15.

On January 15, 2019, the Association formally moved to stay discovery and to dismiss the complaint for lack of subject matter jurisdiction. Dkts. 20, 21. The court denied the motion to stay discovery, explaining,

11

> The defendant answered the complaint. Discovery should already be underway. The defendant has now moved to dismiss for lack of jurisdiction and sought a stay of discovery. If this court indeed lacks jurisdiction, then the case will be transferred to or can be refiled in the appropriate court. The discovery can be used in the follow-on proceeding. There is accordingly no reason to grant a stay, and substantial reason to allow discovery to proceed.

Dkt. 23. The next day, Bragdon filed a motion to compel, noting that the Association "has offered no explanation as to why Plaintiff's discovery could not be answered within [the] almost four (4) months" that had elapsed since Bragdon served the discovery requests. Dkt. 24 ¶ 8.

On February 20, 2019, the court denied the motion to dismiss for lack of subject matter jurisdiction and directed the parties to "report on the status of the pending motion to compel" within one week. Dkt. 33. The next day, the Association served amended responses and objections to the interrogatories. Dkt. 34. Bragdon accordingly withdrew the motion to compel. Dkt. 35.

During discovery, the Association provided an evasive response to a request for admission about the eleven homes with mounting equipment. Bragdon served a straightforward request for admission which read, "Please admit that Patricia Hoffman, President of the [Association], has known about most or all of the [eleven] satellite dishes and satellite dish Mounting Equipment referenced in the . . . Requests for Admission since at least May 29, 2018." Dkt. 53 Ex. M ¶ 28. The Association responded, "Denied." *Id.*

That denial was false. In discovery, the Association produced a fax from Hoffman dated May 29, 2018, which listed homes with mounting equipment. Dkt. 53 Ex. K. The Association claims that its denial technically was accurate because the list of homes

12

included some that Hoffman did not know about. The request for admission asked about "most or all" of the dishes, making this objection non-responsive.

On June 24, 2020, more than two years after filing its answer, the Association purported to move to dismiss Bragdon's request to shift expenses, citing Court of Chancery Rule 12(b)(6). The court denied the motion because the Association had answered the complaint and failed to preserve that defense. The court instead treated the motion as a motion for summary judgment under Court of Chancery Rule 56. *See* Dkt. 47.

The Association recognized three bases that Bragdon might have for recovering his expenses: (i) a provision in the Declaration, (ii) Section 81-417(a) of DUCIOA, and (iii) the bad-faith exception to the American Rule. By order dated July 7, 2020, the court granted summary judgment against Bragdon to the extent he sought expenses under the Declaration, concluding that "[t]he plain language of [the relevant] provision contemplates" the recovery of expenses only "in the event the Owner is found to be in breach." Dkt. 47 ¶ 3. As an owner, Bragdon could not recover expenses from the Association under that provision. *Id.* The court denied the Association's motion as to Bragdon's other two bases for recovering his expenses.

On August 17, 2020, the Association attempted to moot the case by removing the minutes from the community website and clearing the fines from Bragdon's account. The Association again moved to dismiss, this time arguing that "the case is now moot," Dkt. 48 ¶ 8, and that Bragdon's request for expenses "should not change the result," *id.* ¶ 11. In the same filing, the Association alternatively renewed its motion for summary judgment on the issue of Bragdon's entitlement to expenses. *Id.* ¶ 8.

13

Bragdon cross moved for summary judgment on the issue of his entitlement to expenses. When he filed his cross motion, his expenses totaled $12,697.84. Dkt. 53 Ex. N.

On October 26, 2020, the court held a status conference and informed the parties that the cross motions raised disputes of fact. *See* Dkt. 55. The parties subsequently "stipulate[d] and agree[d] to submit the matter to a final adjudication before the Court as based on the written records provided in the pending Cross-Motions for Summary Judgment." Dkt. 57 ¶ 1.

## II.     LEGAL ANALYSIS

Titled "Effect of violations on rights of action; attorneys' fees," Section 81-417 of the DUCIOA provides as follows:

> If a declarant or any other person subject to [the DUCIOA] fails to comply with any of its provisions or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award court costs and reasonable attorneys' fees.

25 *Del. C.* § 81-417(a) (the "Enforcement Provision").

No Delaware case has interpreted the Enforcement Provision. One case referenced it in passing. *See Henlopen Landing Homeowners Ass'n, Inc. v. Vester*, 2019 WL 3484254, at *14 (Del. Ch. Aug. 1, 2019) (observing that the plaintiffs "claim to be entitled to recover legal fees from the Vesters under 10 *Del. C.* § 348(e) (as well as 25 *Del. C.* § 81-417(a))"). Another case held that there was "no basis for an award of fees to the Plaintiff under either of the statutes it cites," one of which was the Enforcement Provision. *See Sandie, LLC v. Plantations Owners Ass'n, Inc.*, 2012 WL 3041181, at *10 (Del. Ch. July 25, 2012). The

14

decision did not analyze or interpret the statute. Without meaningful Delaware precedent, this decision maps *terra incognita*.

## A.     Whether The Enforcement Provision Applies To The Development

A threshold question is whether the Enforcement Provision applies to the Development. The DUCIOA states that "[e]xcept as provided in this subchapter," its provisions apply "to all common interest communities created within this State" after its effective date of September 30, 2009.[3] For common interest communities created before the effective date ("Pre-Existing Communities"), the Unit Property Act provides the statutory framework.[4] A Pre-Existing Community nevertheless may choose to be governed by the DUCIOA by amending one of its governing documents to opt into the statute.[5]

---

[3] 25 *Del. C.* § 81-116. The DUCIOA defines a "common interest community" to mean

> real estate described in a declaration with respect to which a person, by virtue of that person's ownership of a unit, is obligated to pay for a share of real estate taxes, insurance premiums, maintenance, or improvement of or services or other expenses related to common elements, other units or other real estate described in that declaration.

*id.* § 81-103. The DUCIOA creates exceptions for "small condominiums and cooperatives," *id.* § 81-117, "small and limited expense liability planned communities," *id.* § 81-118, and "small preexisting cooperatives and planned communities," *id.* § 81-120.

[4] 25 *Del. C.* § 81-119 ("Without limiting the generality of any other provision of this chapter, and notwithstanding any other provision of this chapter, any condominium created under the Unit Property Act for which future expansions are provided under its declaration made pursuant to the Unit Property Act shall remain governed by the Unit Property Act and not this chapter with respect to all of such future sections, phases or other expansion rights.").

[5] *See id.* ("Any preexisting common interest community or approved common interest community has the right to amend its declaration, code of regulations, bylaws,

15

Even when a Pre-Existing Community has not opted into the DUCIOA, it remains subject to certain specified sections of the statute (the "Enumerated Provisions").[6] Recognizing that the governing documents of a Pre-Existing Community may contain provisions that conflict with the Enumerated Provisions, Section 81-119 of the DUCIOA creates a series of rules that determine when the Enumerated Provisions apply.

Under the general rule, the Enumerated Provisions apply to the exclusion of any conflicting provisions in the governing documents of a Pre-Existing Community. *See id.* The relevant language states,

> [The Enumerated Provisions] apply to all [Pre-Existing Communities]; but those sections apply only with respect to events and circumstances occurring after the effective date, and do not invalidate existing provisions of the [governance documents of Pre-Existing Communities] that do not conflict with this chapter[, i.e., the DUCIOA].

---

declaration plans, or plats or plans or other governing documents, including, but not limited to certificates or articles of incorporation, formation or otherwise to comply with any or all of the requirements of this chapter, or a preexisting common interest community or approved common interest community may select particular additional sections of this chapter to apply to that community without adopting the entire chapter.").

[6] *See id.* The following provisions constitute the Enumerated Provisions:

§ 81-120 (Exception for small preexisting cooperatives and planned communities), and § 81-124 and except as limited by § 81-122 of this title hereof, §§ 81-105, 81-106, 81-107, 81-127, 81-203, 81-204, 81-221, 81-301, 81-302(a)(1) through (6) and (11) through (17), 81-302(f), 81-302(g), 81-303, 81-307(a), 81-309(a), 81-311, 81-315, 81-316, 81-318, 81-321, 81-322 [repealed], 81-323, 81-324, 81-409, and 81-417 of this title, and § 81-103 of this title to the extent any definitions are necessary in construing any of the foregoing sections to the extent the definitions do not conflict with the declaration . . . .

*Id.*

*Id*. Explicitly, this language states only that the Enumerated Provisions do not invalidate provisions "that do not conflict" with the DUCIOA. By negative inference, if an existing provision conflicts with an Enumerated Provision, then the Enumerated Provision supersedes the existing provision. *See Beck v. Greim*, 2020 WL 6742708, at *2 (Del. Ch. Nov. 17, 2020) ("If there is a conflict between an applicable DUCIOA section and a provision in the [community's] Governing Documents, the DUCIOA section will control."). Because "this chapter" refers to the DUCIOA, the reference to "[provisions] that do not conflict with this chapter" might seem to make the entire statute applicable to Pre-Existing Communities. But Section 81-119 only makes the Enumerated Provisions potentially applicable to Pre-Existing Communities. Other than the Enumerated Provisions, the DUCIOA does not apply to Pre-Existing Communities at all, unless the community has opted in.

A different rule applies for Pre-Existing Communities that are condominiums or cooperatives. Section 81-119 of the DUCIOA states,

> With respect to condominiums and cooperatives, such existing provisions of [their governing documents] . . . and not in conflict with the Unit Property Act . . . shall be controlling in the event of any express conflict between those existing [provisions] and the provisions of this chapter[, i.e., the DUCIOA].

25 *Del. C.* § 81-119. In other words, for a Pre-Existing Community that is a condominium or cooperative, if an existing provision conflicts with an Enumerated Provision, then the existing provision applies—so long as the existing provision does not conflict with the Unit Property Act. *See Friends of Vill. of Cinderberry v. Vill. of Cinderberry Prop. Owners Ass'n, Inc.*, 2010 WL 1843706, at *8 (Del. Ch. May 5, 2010) ("[T]he Delaware General

17

Assembly clearly provided a carve-out for condominiums and cooperatives, such that the governance documents of these forms of common-interest communities control when conflicts arise between those documents and the DUCIOA."). Again, because "this chapter" refers to the DUCIOA, the reference to a conflict between existing provisions "and the provisions of this chapter" might seem to make the entire statute applicable to Pre-Existing Communities that are condominiums or cooperatives. But again, Section 81-119 only makes the Enumerated Provisions potentially applicable to Pre-Existing Communities. This aspect of Section 81-119 thus contemplates that the Enumerated Provisions apply to pre-existing condominiums and cooperatives, but that provisions in their governing documents control in the event of express conflicts with the Enumerated Provisions, so long as the provisions in their governing documents do not conflict with the Unit Property Act. In the event of a conflict with the Unit Property Act, then the provisions of the Unit Property Act control. Provisions of the DUCIOA other than the Enumerated Provisions continue not to apply.[7]

The rule for Pre-Existing Communities that are condominiums or cooperatives implicitly acknowledges that Enumerated Provisions apply when the community's governing documents do not address an issue. Section 81-119 of the DUCIOA makes that

---

[7] For a Pre-Existing Community that is a condominium or cooperative, the Enumerated Provisions defer not only to provisions in existence at the time the DUCIOA was adopted, but also to "subsequent amendments thereto adopted subsequent to [the effective date of the DUCIOA] in strict accordance with" those existing provisions. *Id.* § 81-119. To simplify the discussion, the analysis in the main text omits this additional complication.

18

principle explicit for all Pre-Existing Communities by stating, "In matters and as to issues where neither such existing provisions . . . nor the Unit Property Act . . . expressly addresses the matter or issue, the provisions of this chapter[, i.e., the DUCIOA] shall control." *Id.* § 81-119. Here again, this language might seem to make the entire statute apply to Pre-Existing Communities on any issues where their governing documents are silent. But here again, Section 81-119 only makes the Enumerated Provisions potentially applicable to Pre-Existing Communities; other provisions of the DUCIOA do not apply. This aspect of Section 81-119 thus contemplates that the Enumerated Provisions apply to Pre-Existing Communities that are condominiums or cooperatives when their governing documents are silent.

The Development is a Pre-Existing Community. It is also a condominium for purposes of the DUCIOA. *See id.* § 81-103 (defining a condominium as "a common interest community in which portions of the real estate are designated for separate ownership and the remainder of the real estate is designated for common ownership solely by the owners of those portions"). The Development has not opted into the DUCIOA, so only the Enumerated Provisions potentially apply.

The Enforcement Provision is one of the Enumerated Provisions. Because the Development is a pre-existing condominium, any existing provision in its governing documents will apply in the event of a direct conflict with the Enforcement Provision, so long as the existing provision is permitted under the Unit Property Act. If the community's governing documents do not address the issue, then the Enforcement Provision applies.

19

The only provision that potentially conflicts with the Enforcement Provision is Section 11.14 of the Declaration, entitled, "Remedies for Violation of Restrictions." The relevant language states:

> In the event of a violation or breach of any of these restrictions by an Owner or agent of an Owner, by an occupant or agent of an occupant, or by another party, then the Owner of Lots and Units in the Development, the Developer and the Association, or any of them, jointly or severally, shall have the right to proceed at law or in equity to compel compliance therewith . . . . The failure to enforce any rights, reservation, restriction or condition contained in this Declaration, however long continued, . . . shall not bar or affect its enforcement.
>
> Should any person employ counsel to enforce any of the foregoing covenants, conditions, reservations or restrictions, because of a breach of the same, all costs incurred in such enforcement, including a reasonable fee for counsel shall be paid by the Owner of such Lot, Unit or Units in breach thereof.

Decl. § 11.14 (the "Owner Breach Provision") (formatting added). The plain language of the Owner Breach Provision addresses an action against a property owner to enforce a breach of the Declaration by the owner. In such a lawsuit, the Owner Breach Provision obligates the owner to pay all of the claimant's expenses.

The Owner Breach Provision does not address a lawsuit filed by an owner against the Association. It therefore does not cover this case. The court previously ruled on this issue when granting judgment as a matter of law to the Association on the question of whether Bragdon could recover expenses under the Owner Breach Provision. *See* Dkt. 47. That ruling is law of the case. *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally

20

appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

The Owner Breach Provision therefore does not give rise to "any express conflict" with the Enforcement Provision for purposes of Bragdon's application for expenses. *See* 25 *Del. C.* § 81-119. Only the Enforcement Provision addresses that issue. Because there is no express conflict, Bragdon can rely on the Enforcement Provision to recover his expenses from the Association.

## B.     The Violation Requirement

Under the plain language of Enforcement Provision, a person has a right of action and can potentially recover expenses "[i]f a declarant or any other person subject to [the DUCIOA] fails to comply with any of its provisions or any provision of the declaration or bylaws." 25 *Del. C.* § 81-417. This decision refers to this dimension of the Enforcement Provision as the "Violation Requirement."

The seemingly straightforward language of the Violation Requirement conceals complexities. The easy part of the Violation Requirement is its reference to "the declaration." The DUCIOA defines the "declaration" as "the recorded instruments, however denominated, that create a common interest community, including any amendments to those instruments." *Id.* § 81-103(17). Under the plain language of Enforcement Provision, Bragdon can satisfy the Violation Requirement and potentially recover expenses if the Association violated a provision of the Declaration.

The more complex part of the Violation Requirement is the reference to the DUCIOA. As discussed, only the Enumerated Provisions potentially apply to a Pre-

21

Existing Community like the Development. Because the Development is a condominium, the Enumerated Provisions only apply to the extent that the Development's governing documents are silent. Bragdon therefore can satisfy the Violation Requirement and potentially recover expenses if the Association violated an Enumerated Provision that does not conflict with a provision in the Development's governing documents.

The most complex part of the Violation Requirement is the reference to "bylaws." The DUCIOA defines the "bylaws" as

> the recorded document (and any recorded amendments thereto) that contains the procedures for conduct of the affairs of the association of a common interest community in accordance with § 81-306 of this title, regardless of the form of the association's legal entity or the name by which the document comprising the bylaws is identified.

*Id.* § 81-103(6). The DUCIOA defines "recorded" as "with respect to the declaration or bylaws of a common interest community and any amendments thereto, to be placed of record at the office for the recorder of deeds in and for each county in which any portion of the common interest community is located." *Id.* § 81-103(38).

Through these definitions, the DUCIOA appears to contemplate that an association will have a single set of "bylaws" on file with the recorder of deeds. This concept of "bylaws" creates difficulties when the association is an entity whose internal corporate contract consists of multiple documents.

The internal governance structure of the Association illustrates the problem. Because a Delaware member corporation like the Association is governed by the DGCL, it necessarily has both a certificate of incorporation and bylaws. *See* 8 *Del. C.* §§ 102(a), 109. Together, the DGCL and these documents constitute the entity-specific corporate

22

contract for the Association. They also form a hierarchy, comprising from top to bottom (i) the DGCL, (ii) the certificate of incorporation, and (iii) the bylaws. "Each of the lower components of the contractual hierarchy must conform to the higher components. A bylaw that conflicts with the charter is void, as is a bylaw or charter provision that conflicts with the DGCL." *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at *6 (Del. Ch. Jan. 22, 2015).

The DUCIOA's concept of "bylaws" intersects imperfectly with this structure because it seemingly elevates the bottom rung of the hierarchy over higher rungs. Assume that a community association attempts to adhere to DUCIOA by filing its bylaws with the recorder of deeds, making them "bylaws" for purposes of the DUCIOA. Further assume that the bylaws contain provisions that are inconsistent with the DGCL. Under a standard corporate law analysis, the bylaw provisions would be invalid. The DUCIOA, however, provides that "the laws of this State that apply to the association's form of legal entity apply to the association except to the extent that law is inconsistent with [the DUCIOA], in which case [the DUCIOA] governs." 25 *Del. C.* § 81-108. Elsewhere, the DUCIOA underscores this proposition as applied to the DGCL, stating that "[a]ny association that is a Delaware corporation shall also be subject to the [DGCL], which shall govern and control to the extent not inconsistent with this chapter." *Id.* § 81-326.

The obvious purpose of these provisions is to ensure that when the DUCIOA establishes mandatory governance requirements for an association, those provisions apply. But an expansive reading of those provisions arguably would place the association's

bylaws (as defined by the DUCIOA) on the highest rung of the hierarchy, superseding the association's certificate of incorporation and the DGCL in the event of a conflict.

A different (and, in my view, more logical) approach is to use traditional entity-law principles to derive the entity-specific contract. For purposes of the Association, that means consulting its charter, bylaws, and the DGCL, then applying the traditional corporate hierarchy to determine what provisions control. The outcome of that analysis establishes the entity-specific contract for the association that must be measured against the DUCIOA. To the extent that the entity-specific contract contains provisions that conflict with the DUCIOA, then the DUCIOA necessarily controls.

The principal policy rationale for DUCIOA's emphasis on a recorded set of "bylaws" seems to be an understandable desire to enable owners to have public access to an official set of "bylaws" on which they can rely. That is a laudable justification, but it creates complications because of its imperfect fit with Delaware entity law. The approach that this decision proposes resolves that problem, while still fulfilling the goal of public access: the certificate of incorporation is a publicly available document, and anyone can access the DGCL online. The primary benefit of this approach is that it preserves standard principles of corporate law analysis and then introduces the DUCIOA as an overlay.[8]

---

[8] This solution only addresses an association that is organized as a corporation. It might not work for other entities. The DUCIOA provides that an association "may be organized as a profit or nonprofit unincorporated association, corporation, trust, limited liability company or other lawful form of legal entity authorized by the laws of this State." 25 *Del. C.* § 81-301. The relevant governance documents for all of those entities may not be uniformly available.

Fortunately, this decision need not wrestle with the bylaws aspect of the Violation Requirement. Bragdon has established that the Association (i) breached the Declaration and (ii) violated a mandatory provision of the DUCIOA that applies to the Association, as a pre-existing condominium.

### 1.     The Breach Of The Declaration

The Declaration provides that "[n]o . . . maintenance, repair or replacement shall be undertaken by the [Association], except in an emergency, without giving the Owner notice of the action required and an opportunity to undertake such action." Decl. § 6.3.2. Bragdon proved that the Association did not provide him with the requisite notice and an opportunity to take corrective action before having the mounting bracket removed.

---

The complexities created by the interactions between the DUCIOA and various entity laws may counsel in favor of restricting the types of entities that can serve as an association. Delaware generally favors private ordering, but in this setting, too much choice may be a bad thing. *See generally* Barry Schwartz, *The Paradox of Choice: Why More Is Less* (2004). If the DUCIOA limited the types of entities that could serve as associations, then the statue could spell out the interrelationships among the governing documents.

The situation for a Pre-Existing Community governed by the Unit Property Act is even more complex because the Unit Property Act contemplates that every unit property will have a "code of regulations," defined as "such governing regulations as are adopted pursuant to this chapter for the regulation and management of the property, including such amendments thereof as may be adopted from time to time." 25 *Del. C.* § 2202(2). The Unit Property Act does not address how the code of regulations interacts with the certificate or bylaws of an association.

Parsing these issues is difficult for judges and lawyers. The individuals who must work with the governing documents of a community on a day-to-day basis often are laypeople serving on the board of an association or as its officers. Good reason exists to think that a simplified structure would assist them in fulfilling their obligations.

25

Bragdon received two notices before the Association hired a contractor to remove the mounting bracket. The first was the October Notice, which only referred to the dish. It did not refer to the mounting bracket. By the time he received the October Notice, Bragdon had already removed the dish. When Bragdon asked Seascape about the October Notice, Seascape told that him that he had cured the violation.

The second notice that Bragdon received was the January Notice, which was the first notice to mention the mounting bracket. The January Notice claimed incorrectly to be "the third attempt to notify you that the satellite dish has not been removed completely." Compl. Ex. D. It levied "a second fine in the amount of $100 (invoice included)." *Id.* It further stated that the Association "will have the bracket removed at the owner's expense." *Id.* Less than two weeks later, the Association followed through on its threat by having a contractor remove the bracket.

Before the January Notice, Bragdon had not received any other notice that described the mounting bracket (rather than the dish) as violating the Architectural Guidelines. The Declaration required the Association to give Bragdon both "notice of the action required" and "an opportunity to undertake such action." Decl. § 6.3.2. The January Notice described the action required, i.e., removal of the mounting bracket, but it did not give Bragdon sufficient opportunity to take corrective action. It rather stated, "The [Association] will have the bracket removed at the owner's expense." Compl. Ex. D.

By stating that the Association would have the bracket removed rather than giving Bragdon an opportunity to remove the bracket, the Association breached the Declaration. Bragdon thus satisfied the Violation Requirement.[9]

### 2. The Violation Of The DUCIOA

Section 81-302(f) of the DUCIOA provides that the executive board of an association

> shall use its reasonable judgment to determine whether to exercise the association's powers to impose sanctions and pursue legal action for violations of the declaration, bylaws and rules including, without limitation, whether to compromise any claim made by or against it, including claims for unpaid assessments.

25 *Del. C.* § 81-302(f). The executive board "may not be arbitrary or capricious in taking enforcement action." *Id.* Section 81-302(f) is an Enumerated Provision that applies to a Pre-Existing Community and does not conflict with any provision in the Development's governing documents. *See id.* § 81-119. It therefore applies to the Development. *See* Part II.A, *supra*.

---

[9] Bragdon also contends that the Association's conduct breached Section 11.14 of the Declaration, which provides,

> [T]he Developer shall have the right, whenever any improvement is built in violation of this Declaration, to enter upon the property where such violation exists, and summarily abate or remove the same at the expense of the Owner, if after thirty (30) days written notice of such violation, it shall not have been corrected by the Owner.

Decl. § 11.14. This section, however, imposes an obligation on the Developer, which is distinct from the Association. The Association could not have breached the notice provision in Section 11.14 because that provision did not impose any obligations on the Association.

Bragdon proved that the Board acted in an arbitrary and capricious manner when taking enforcement action against him. Bragdon complied with the rules and regulations of the Association by obtaining the necessary approval for a dish. When the installer placed the dish on the roof instead of the fascia, Bragdon immediately noticed and had the dish removed. When he received the October Notice, he contacted Seascape, and Seascape confirmed that he had cured the violation by removing the dish. That should have been the end of it.

Instead, the Association sent Bragdon the January Notice and three invoices, each dated January 18, 2019. Each imposed a fine on Bragdon for not removing the mounting bracket. Each fine deviated from the amounts authorized under the Association's rules and regulations. Under the approved schedule of fines, a first violation should have resulted in a written warning, but no fine. A second violation should have resulted in another written warning, plus a $50 fine. A third violation should have resulted in a $100 fine. At best, the January Notice was Bragdon's second notice, so the maximum fine should have been $50. In reality, the January Notice was Bragdon's first notice of a violation based on the mounting bracket. The October Notice only identified the dish as violating the Architectural Guidelines, and Seascape told Bragdon that he had cured the violation by removing the dish. For the first notice of a violation, the Association should not have imposed any fine.

The Association also treated Bragdon differently than similarly situated owners. At least eleven other residents had mounted dishes improperly, removed them, and left behind the mounting equipment. The Association never took enforcement action against those

28

residents. The Association also had never conducted an open meeting on an owner's appeal of a fine, nor posted the meeting minutes to the community website.

The Association again departed from its rules and procedures after hearing Bragdon's appeal. Seascape advised the Board that the communications regarding the violation were inconsistent, and the Board determined that the January Notice therefore constituted the first notice of a violation. As such, Bragdon should not have been fined, but the Board decided to impose a fine of $50. Rather than implementing that decision, the Association issued a revised invoice that imposed a fine of $100. The Association also retroactively claimed that on December 11, 2017, the Association had imposed a fine of $50 fine on Bragdon for failing to apply for approval to install the dish. The fine itself was a bit of revisionist history, and the underlying premise was incorrect: Bragdon had submitted an application and received approval before installing the dish. Adding insult to injury, the revised invoice imposed a late fee of $37.46 on those amounts.

Through this conduct, the Association acted in an arbitrary and capricious manner. The most persuasive explanation for the Association's conduct is Bragdon's assertion that the Board was retaliating against him for pursuing the Governance Action. Bragdon thus has established that the Association violated a mandatory provision of the DUCIOA. This violation independently satisfies the Violation Requirement.

## C. An Adverse Effect

To recover expenses under the Enforcement Provision, a party must have been "adversely affected" by the breach of the Violation Requirement. 25 *Del. C.* § 81-417. Bragdon easily satisfies this element. The Association fined him and charged him for the

cost of removing the mounting bracket from the roof of the Condominium. After Bragdon sued, the Association eventually cleared his account of all fines and charges, but by then, Bragdon already had incurred over $12,000 in expenses pursuing this action. Compared to his situation before the Association's violations, Bragdon has been adversely affected.

## D. An Appropriate Case

The final question is whether this is "an appropriate case" for expense shifting. Bragdon has satisfied that test by showing that the Association acted unreasonably. The Association breached the Declaration, enforced its rules in an arbitration and capricious manner, and engaged in sharp practices during the resulting lawsuit. Under the DUCIOA, this is an easy case for expense shifting.

### 1. The Uniform Laws

As noted, no Delaware decision has interpreted the Enforcement Provision, much less explored the concept of an "appropriate case" under the DUCIOA. But as its name implies, the DUCIOA is based on the Uniform Common Interest Ownership Act (the "Common Interest Act"), which is a uniform statute drafted by the Uniform Law Commission (the "Commission"). The Common Interest Act therefore provides a helpful source of interpretive guidance.

The General Assembly adopted the DUCIOA on October 31, 2008, with an effective date of September 30, 2009. *See* 76 Del. Laws ch. 422 (2008). When the General Assembly

30

enacted the DUCIOA, the Common Interest Act was on its third version.[10] The

Commission prepared the third version because

> it had become increasingly clear by the time the drafting committee was
> created in 2005 that major tensions remained in the common interest
> community field that neither [the Common Interest Act] or any of its
> constituent Acts-nor most State statutes in this field--adequately addressed.
> *Those tensions principally involved the perception that individual unit
> owners were often unduly disadvantaged in their dealings with the elected
> directors and employee/managers of unit owner associations.*

Unif. Common Int. Ownership Act (Refs & Annos) (Unif. L. Comm'n 2008) (emphasis

added). The third version of the Common Interest Act therefore "systematically identified

those areas where there have been allegations that those who control the decision-making

apparatus of associations have either abused the rights of individual unit owners, or suffer

from such inadequate legislation that they are unable to adequately assist their owners." *Id.*

The overall goal of the third version was to "enhance the considerable protections for unit

owners' rights" that previously existed under earlier versions of the Common Interest Act.

*Id.*

---

[10] The Commission promulgated the original version in 1982, and Alaska, Colorado, Connecticut, Minnesota, Nevada, and West Virginia adopted it. *See* Unif. Common Int. Ownership Act (Refs & Annos) (Unif. L. Comm'n 1982); Unif. L. Comm'n, *Common Interest Ownership Act (1982)*, https://www.uniformlaws.org/committees/community-home?CommunityKey=74c0f570-256a-4cc6-b3c0-ee707d968e4a (last visited Mar. 9, 2021). The Commission promulgated the second version in 1994, and Connecticut and Vermont adopted it. *See* Unif. Common Int. Ownership Act (Refs & Annos) (Unif. L. Comm'n 1994); Unif. L. Comm'n, *Common Interest Ownership Act (1994)*, https://www.uniformlaws.org/committees/community-home?CommunityKey=9aa4a531-0ae5-4f72-b164-016c7da85482 (last visited Mar. 9, 2021). The Commission adopted the third version in 2008, and Connecticut, Delaware, Vermont, and Washington adopted it. *See* Unif. Common Int. Ownership Act (Refs & Annos) (2008).

When enacting the DUCIOA, the General Assembly included considerable Delaware-specific content. The General Assembly also adopted some provisions from earlier versions of the Common Interest Act. Prime examples of the former are the provisions governing the extent to which DUCIOA applies to Pre-Existing Communities, which this decision has discussed. *See* Part II.A, *supra*. An example of the latter is the Enforcement Provision. The language of the Enforcement Provision tracks Section 4-117(a) of the second version of the Common Interest Act:

> If a declarant or any other person subject to this [Act] fails to comply with any of its provisions or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. Punitive damages may be awarded for a willful failure to comply with this [Act]. The court, in an appropriate case, may award court costs and reasonable attorney's fees.

Unif. Common Int. Ownership Act § 4-117 (1994) (bracketed text in original). The only meaningful difference is that the Enforcement Provision omits the authorization for punitive damages.

The commentary to Section 4-117 of the second version of the Common Interest Act offers the following insight into the provision:

> This section provides a general cause of action or claim for relief for failure to comply with the Act by either a declarant or any other person subject to the Act's provisions. Such persons might include unit owners, persons exercising a declarant's rights of appointment pursuant to Section 3-103(d), or the association itself. A claim for appropriate relief might include damages, injunctive relief, specific performance, rescission, or reconveyance if appropriate under the law of the State, or any other remedy normally available under state law. The section specifically refers to "any person or class of persons" to indicate that any relief available under the state class action statute would be available in circumstances where a failure to comply with this Act has occurred. This section specifically permits punitive damages to be awarded in the case of willful failure to comply with the Act

32

and also permits court costs and attorney's fees to be awarded in the discretion of the court to any party that prevails in an action.

*Id.* cmt. 1.

Section 4-117(a) of the second version remained relatively unchanged from Section 4-117(a) of the first version of the Common Interest Act. *See* Unif. Common Int. Ownership Act § 4-117(a) (1982). The first version omitted the words "court costs" before "reasonable attorneys' fees," but otherwise used the same phrasing. The commentary was substantively identical. *See id.* cmt. 1.

Section 4-117(a) in the third version of the Common Interest Act used slightly different language:

> A declarant, association, unit owner, or any other person subject to this [act] may bring an action to enforce a right granted or obligation imposed by this [act], the declaration, or the bylaws. [Punitive damages may be awarded for a willful failure to comply with this [act].] The court may award reasonable attorney's fees and costs.

Unif. Common Int. Ownership Act § 4-117(a) (2008). The third version thus dropped the reference to "in an appropriate case," but continued to make expense shifting discretionary. The commentary continued to observe that the section permits "permits court costs and attorney's fees to be awarded in the discretion of the court to any party that prevails in an action." *Id.* cmt. 1.

The DUCIOA states that it "shall be applied and construed so as to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." 25 *Del. C.* § 81-110. Because Delaware lacks precedent interpreting the

Enforcement Provision, this decision considers authority from other states that have adopted similar versions of the Enforcement Provision.[11]

Interpreting decisions from other jurisdictions requires care because several states that adopted the Common Interest Act changed the language of the enforcement provision. For example, Minnesota and Nevada included language limiting expense shifting to a prevailing party. *See* Minn. Stat. § 515B.4-116(b) (2020) ("The court may award reasonable attorney's fees and costs of litigation to the prevailing party."); Nev. Rev. Stat. § 116.4117.6 (2019) ("The court may award reasonable attorney's fees to the prevailing party."). Colorado went in the opposite direction by making expense shifting mandatory. Colo. Rev. Stat. § 38-33.3-123(1)(d)(I) (2019).[12]

The etymological search for insight into the phrase "in an appropriate case" leads next to the Uniform Condominium Act (the "Condominium Act"), where the phrase

---

[11] *See, e.g.*, *DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 393 (Del. 2000) (analyzing "decisions of other jurisdictions that have enacted a form of the Uniform Arbitration Act"); *Kronenberg v. Katz*, 872 A.2d 568, 598 (Del. Ch. 2004) (observing that a court "would likely look to decisions of other states interpreting the identical provisions in their versions of the Uniform Act"). *Cf. Brown v. State*, 967 A.2d 1250, 1254 (Del. 2009) (declining to follow other state decisions interpreting the Uniform Controlled Substances Act because Delaware already had adopted a different approach).

[12] Colorado also limited the ability of an association to force an owner who prevailed in an action brought by the association to bear a share of the association's costs. The provision states that if the owner proves that it did not commit the alleged violation, then "[t]he court shall award the unit owner reasonable attorney fees and costs incurred in asserting or defending the claim," and "the association shall be precluded from allocating to the unit owner's account with the association any of the association's costs or attorney fees incurred in asserting or defending the claim." *Id.* § 38-33.3-123(1)(d)(I), (II).

appears to have originated. The Commission promulgated the original version of the Condominium Act in 1977. *See* Unif. Condo. Act (Unif. L. Comm'n 1977). Section 4-117 of the Condominium Act contains language that anticipated the identically numbered sections of the 1983 and 1994 versions of the Common Interest Act, including the following final sentence: "The court, in an appropriate case, may award reasonable attorney's fees." *Id.* § 4-117. The commentary states, "This section . . . permits attorney's fees to be awarded in the discretion of the court to any party that prevails in an action." *Id.* cmt. 1. As it did with the Common Interest Act, the Commission subsequently amended the Condominium Act to eliminate the "in an appropriate case" language. *See* Unif. Condo. Act § 4-117(a) (Unif. L. Comm'n 2017) ("The court may award reasonable attorney's fees and costs.").

The Commission promulgated the Condominium Act because "early statutes were inadequate to deal with the growing condominium industry. In particular, many states perceived a need for additional consumer protection, as well as a need for more flexibility in the creation and use of condominiums." Unif. Condo. Act (Refs & Annos) (1977). Courts have noted regularly that the Condominium Act is a consumer-friendly statute.[13]

---

[13] *See, e.g.*, *Mullowney v. Masopust*, 943 A.2d 1029, 1032, 1033 (R.I. 2008) (recognizing "the consumer protection purpose of the statute"; "[T]he Condominium Act contains a strong consumer protection flavor . . . ." (internal quotation marks omitted)); *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc.*, 61 P.3d 1094, 1103 (Wash. 2002) (en banc) ("Washington's Condominium Act contains extensive protections for condominium consumers. We find that the various provisions of the Act should be construed with this purpose as controlling."); *Levin & Stein v. Meadow Valley Condo. Owners Ass'n*, 157 Wash. App. 1003, 2010 WL 2910909, at *5 (July 26, 2010) ("[T]he

After drafting the Condominium Act and two other statutes that addressed other specific types of common interest communities, the Commission prepared the Common Interest Act to create a single statute to govern "[t]he three most common forms of common ownership"—"condominiums, cooperatives and so-called 'planned unit developments.'" Unif. Common Int. Ownership Act (Refs & Annos) (1982). The same consumer-friendly policies that motivated the predecessor statutes thus animate the Common Interest Act.

Sixteen states adopted the Condominium Act.[14] Seven included the signature phrase "in an appropriate case" in their versions of the enforcement provision.[15]

## 2. The Principle Of Broad Discretion

The various uniform acts and cases from other jurisdictions coalesce on one principle: The Enforcement Provision grants broad discretion to the trial court to

---

Association's action was a legitimate effort to enforce the [Washington Condominium Act's] consumer protection provisions." (internal quotation marks omitted)).

[14] Those states are Alabama, Arizona, Kentucky, Louisiana, Maine, Minnesota, Missouri, Nebraska, New Hampshire, New Mexico, North Carolina, Pennsylvania, Rhode Island, Texas, Virginia, and Washington, all of which adopted the 1977 version. *See* Unif. Condo. Act (Refs & Annos) (1977). No additional states have adopted the Condominium Act since the Commission promulgated the 2017 version.

[15] Those states are Alabama, Minnesota, Missouri, Nebraska, New Mexico, Rhode Island, and Washington. *See* Ala. Code § 35-8A-414 (2019) ("The court, in an appropriate case, may award reasonable attorney's fees to either party."); Minn. Stat. § 515A.4-117 (2019) ("The court, in an appropriate case, may award reasonable attorneys' fees."); Mo. Rev. Stat. § 448.4-117 (2019) ("The court, in an appropriate case, may award reasonable attorney's fees."); Neb. Rev. Stat. § 76-891-01 (2019) (same); N.M. Stat. Ann. § 47-7D-17 (2019) (same); 34 R.I. Gen. Laws § 34-36.1-4.17 (2019) (same); Wash. Rev. Code § 64.34.455 (2019) ("The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party.").

determining what constitutes "an appropriate case." Interpreting the Alabama version of

the Common Interest Act, the Supreme Court of Alabama explained that "the determination

of whether a 'case' is 'appropriate' for an attorney-fee award under [the enforcement

provision]" is a "matter[] that [is] within the discretion of the trial court." *Ross v. W. Wind*

*Condo. Ass'n, Inc.*, 216 So. 3d 438, 444 (Ala. Civ. App. 2016). Other courts have made

similar observations.[16] When interpreting Rhode Island's version of the Condominium Act,

the Supreme Court of Rhode Island commented that its enforcement provision, which

tracks the language of the Enforcement Provision, "vests significantly broader discretion

in the presiding judicial officer than is the case with some other statutes that authorize the

awarding of attorneys' fees." *Mullowney*, 943 A.2d at 1034 n.4.

Granting broad discretion to the trial court to determine what is an "appropriate

case" finds support in the commentary to the various iterations of the Common Interest

Act, which refer to a trial court's discretion to award expenses. It also implements the plain

language of the Enforcement Provision, which makes expense shifting permissive. And it

---

[16] *See, e.g.*, *Hyland Hill N. Condo. Ass'n, Inc. v. Hyland Hills Co.*, 1998 WL 531852, at *5 (Minn. Ct. App. Aug. 25, 1998) ("Under the Uniform Condominium Act, the decision to award attorney fees is within the discretion of the district court."); *Green v. Plaza in Clayton Condo. Ass'n*, 410 S.W.3d 272, 281 (Mo. Ct. App. 2013) ("We review the denial of a request for attorneys' fees for an abuse of discretion." (internal quotation marks omitted)); *Mullowney*, 943 A.2d at 1032 ("With respect to the issue of attorneys' fees, this Court will uphold a presiding judicial officer's award of attorneys' fees unless such award constitutes an abuse of discretion.").

comports with Delaware law, which generally treats expense shifting as a discretionary matter for the trial court.[17]

The fact that a trial court has discretion, however, is only part of the story. The existence of discretion leaves open questions such as what factors to consider or what standard to use. Unfortunately, the widespread emphasis on a trial court's discretion when shifting expenses under the Common Interest Act or the Condominium Act makes it difficult to derive principles from precedent. Most decisions simply rely on the existence of discretion when justifying an outcome. Only a small minority of cases, discussed below, providing insight into the factors that courts have considered when shifting expenses.

### 3. No Requirement Of Bad Faith

A second readily apparent principle is that an award of expenses under the Enforcement Provision does not require a showing of bad faith. The Association argues that the "appropriate case" standard "is an analog of the bad-faith exception" to the American Rule. Dkt. 48 ¶ 14. The Association provides no support for this assertion, which

---

[17] *See, e.g.*, *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 341 (Del. 2013) ("We review the Vice Chancellor's interpretation of a contractual fee-shifting provision *de novo*, but we review his decision to award attorneys' fees and costs for an abuse of discretion."); *Nat'l Grange Mut. Ins. Co. v. Elegant Slumming, Inc.*, 59 A.3d 928, 933 (Del. 2013) ("We review an award of attorney's fees under [a fee-shifting statute] to determine if the trial court abused its discretion in awarding such fees."); *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) ("This Court reviews the award or denial of attorneys' fees under exceptions to the American Rule for abuse of discretion.").

is contrary to the plain language of the Enforcement Provision and authorities from other jurisdictions.

When interpreting statutes, Delaware courts strive to avoid creating surplusage. *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011). When the General Assembly enacted the DUCIOA, Delaware decisions already acknowledged the bad-faith exception to the American Rule. *See, e.g.*, *Slawik v. State*, 480 A.2d 636, 639 n.5 (Del. 1984). Interpreting the language of the Enforcement Provision to require bad faith would mean that the General Assembly simply restated the common law, rendering the Enforcement Provision surplusage. The anti-surplusage principle teaches that by authorizing the shifting of expenses in an "appropriate case," the General Assembly intended something different. *Cf. Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *2 (Del. Ch. Dec. 31, 2020) (finding it "obvious" that when parties to a contract included a provision authorizing the awarding of expenses "on an equitable basis," they "meant something other than ... 'apply the American Rule'").

Other states have concluded that conduct need not involve bad faith to make shifting expenses appropriate under the Common Interest Act. Connecticut courts have clarified that a party need not establish that the opposing party committed a "willful violation" of Connecticut's version of the Common Interest Act to recover expenses. *Crystal Lake Condo. Ass'n, Inc. v. New Eng. Equity, Inc.*, 2002 WL 31559954, at *1 (Conn. Super. Ct. Oct. 31, 2002). In reaching that conclusion, the *Crystal Lake* court distinguished the recovery of expenses from an award of punitive damages, noting that the latter generally requires a "willful violation," but the former does not. *Id.* Vermont's courts similarly have

held that Vermont's version of the Common Interest Act does not require a "showing of bad faith or deliberate misconduct" for expense shifting. *Arapaho Owners Ass'n, Inc. v. Alpert*, 128 A.3d 397, 406 (Vt. 2015).[18]

Precedent from other jurisdictions instead indicates that a court will examine how a party behaved both before and during the litigation to determine whether the party acted unreasonably. The factors that contribute to a finding of unreasonableness often will resemble the factors used to establish bad faith, but without necessitating a showing sufficient to establish *scienter.*

One illustrative decision is *Success Village Apartments, Inc. v. Bird*, 2020 WL 1932346 (Conn. Super. Ct. Mar. 12, 2020). There, the Superior Court of Connecticut shifted expenses after concluding that the defendants could have made "proper use of their collective majority voting position on the Board of Directors" to achieve their goal of steering a contract to a certain company, but instead enacted a "scheme to cut corners and bypass normal corporate procedures by acting outside the corporate governance framework

---

[18] In both Connecticut and Vermont, the relevant decisions issued after the states had amended their versions of the Common Interest Act to eliminate the signature phrase "in an appropriate case." Both states retained enforcement provisions which grant broad authority for permissive awards of expenses. Connecticut amended its statute in 1995. Conn. Gen. Stat. § 47-278 (2012), *amended by* 1995 Conn. Legis. Serv. P.A. 95-187 (S.H.B. 6988) § 26 (West). Vermont amended its statute in 2010. *See* Vt. Stat. Ann. tit. 27A, § 4-117 (West 2012), *amended by* 2010 Vt. Legis. Serv. No. 155 (H. 689) § 47 (West). The Supreme Court of Vermont held that "[t]he difference in language in the two versions is of no moment." *Arapaho*, 128 A.3d at 406. The Commission made a similar change to the Common Interest Act in 2008. As the commentary to the Common Interest Act makes clear, the change was non-substantive.

and the applicable statutes . . . ." *Id.* at *9. That conduct justified expense shifting. *Id.* Based on the defendants' ability to pay, the court limited the award to $5,000 out of the $53,879 that the plaintiffs sought. *Id.* at *10.

Another example is *Mullowney v. Masopust*, where the Supreme Court of Rhode Island affirmed a trial court's decision to shift expenses under the enforcement provision in Rhode Island's version of the Condominium Act. The owner of a condominium with a private marina challenged the board's method for imposing assessments on boat slips. 943 A.2d at 1030–31. Rather than using an equal-shares formula, the board imposed assessments based on the size of the slip, reasoning that because "owners of larger slips receive a proportionately greater benefit from the money expended to maintain and operate the marina, the more equitable allocation method would be one based on slip size." *Id.* at 1032. The trial court concluded that the method violated the plain language of Rhode Island's version of the Condominium Act, which stated that differential methods of assessment were "permissible—but only *to the extent required by the declaration*." *Id.* at 1034 (emphasis in original). The declaration in question permitted, but did not require, a differential method of allocation, so the board's method of imposing assessments violated the Condominium Act. *Id.*

The *Mullowney* trial court shifted expenses after concluding that the board acted unreasonably by ignoring the plain language of the declaration and causing plaintiffs to "suffer the expense of substantial and complex litigation in order to vindicate their rights." 943 A.2d at 1035 (internal quotation marks omitted). On appeal, the Supreme Court of Rhode Island clarified that "unreasonable action would . . . be a sufficient predicate for

making this case an appropriate one for the award of attorneys' fees . . . ." *Id.* at 1035 n.5. The Supreme Court of Rhode Island found that the trial court properly exercised its discretion. *Id.*

### 4. Facts Warranting Expense Shifting

The Association's conduct in this case was arbitrary and capricious, making this an easy case for expense shifting. As this decision already has discussed, the Association wrongfully targeted Bragdon by enforcing the Architectural Guidelines selectively and in a manner inconsistent with the Association's past practice. The Association imposed fines and charges that did not comply with the Association's own rules. When Bragdon appealed, the Association again departed from its past practice. The Association then levied a fine that did not reflect the Board's decision.

The Association also engaged in unreasonable litigation conduct. First, the Association delayed answering the complaint until after Bragdon moved for a default judgment. Then, the Association delayed the progress of the case. The Association refused to provide discovery, effectively granting itself a ten-month stay. Once the Association formally moved for a stay, Bragdon opposed it, and the court denied it. Dkt. 23. Yet the Association still did not begin responding to discovery until after Bragdon filed a motion to compel. *See* Dkts. 24, 30.

During discovery, the Association provided an inaccurate response to a request for admission regarding Hoffman's knowledge that some or all of eleven units in the Development had mounting equipment on their roofs. The Association denied the request without elaboration, even though a fax from Hoffman listed several of the units.

42

The Association also never adequately explained the two inconsistent letters dated December 11, 2017, which the Association produced in discovery and claims to have sent. One purported to impose a first fine, and the other purported to impose a second fine. Bragdon averred that he never received either letter. His statement finds support in an invoice from the Association, dated January 1, 2018, which did not identify any fines. If either letter had been sent when the Association claimed, then a fine should have appeared on the January 1 invoice.

The Association's litigation conduct went beyond reasonable efforts to defend the case. Even setting aside the Enforcement Provision, the failure to admit the existence of the eleven homes with mounting brackets itself provides a basis for awarding at least some of Bragdon's expenses. *See* Ct. Ch. R. 37(c). The Association's conduct during the litigation combines with its pre-litigation conduct to make this an easy case for expense shifting under the Enforcement Provision.

In response, the Association argues that Bragdon's lawsuit "is not a derivative case serving the broader interests of the community's members." Dkt. 48 ¶ 17. The Association also claims that Bragdon is not "redressing a significant injustice or disputing a large fine or lien." *Id.* Neither consideration defeats the conclusion that this is an appropriate case for expense shifting. As discussed, the Common Interest Act is a consumer-friendly statute that seeks to protect owners. The drafters of the Common Interest Act were particularly concerned with discriminatory and overbearing enforcement efforts. In this case, the Association levied fines and costs of $395 against Bragdon. Faced with relatively small fines like these, the economically rational course would have been to pay the fines, even

43

though they were wrongfully imposed. Awarding expenses in this case protects the Association's members against similarly arbitrary and capricious action by the Board. Awarding expenses also incentivizes litigants to deal with litigation promptly, rather than dragging out the process as the Association did. Given the serious nature of the Association's conduct, the size of the fine makes an award of expenses more appropriate, not less appropriate.

The Association's conduct before the litigation was arbitrary and capricious. The Association's conduct during the litigation was unreasonable. Either suffices to shift expenses under the DUCIOA.

### 5. The Mootness Argument

Moving beyond its conduct before and during the litigation, the Association argues that this is not an appropriate case for expense shifting because the Association mooted the underlying claims. The Association did address the underlying harms, but it plainly did not moot the entire case, because it refused to pay Bragdon's expenses. To justify that decision, the Association explains that it did not "offer[] to pay Plaintiff's fees because those funds are ultimately coming from owners' pockets." Dkt. 59 at 14. That explanation, however, does not nullify a claim under the Enforcement Provision. Given the structure of a common interest community, the General Assembly necessarily understood when enacting the DUCIOA that expense shifting under the Enforcement Provision could result in the members of an association having to fund an award of expenses. The General Assembly nevertheless adopted the Enforcement Provision. Bragdon's claim for expenses therefore remains live.

Read charitably, the Association's mootness argument can be construed to contend that Bragdon did not prevail in the litigation and therefore cannot receive an expense award. The Supreme Court of the United States has held that when a federal statute authorizes a court to award expenses to a "prevailing party," the party can recover expenses only if the party "has been awarded some relief by the court," such as by securing a judgment on the merits or through a court-ordered consent decree. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001). The Court held that a party could not satisfy the prevailing party requirement based on "[a] defendant's voluntary change in conduct," because even if that change "accomplish[es] what the plaintiff sought to achieve by the lawsuit, [it] lacks the necessary judicial *imprimatur*" required for expense shifting. *Id.* at 605. The *Buckhannon* doctrine only applies to federal statutes, but parties have relied on it in state court. *See, e.g.*, *Montgomery v. 232511 Invs., Ltd.*, 49 A.3d 143, 146–48 (Vt. 2012).

The plain language of the Enforcement Provision does not support the application of the *Buckhannon* doctrine. The General Assembly did not include prevailing party language in the Enforcement Provision. The General Assembly clearly knew how to include prevailing party language, because it appears in a different provision of the DUCIOA. *See* 25 *Del. C.* § 81-316(g) (providing that in an action to enforce an association's lien for assessments, "[a] judgment or decree in any action brought under this section must include costs and reasonable attorney's fees for the prevailing party"). "When the legislature 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislative body] acts

45

intentionally and purposely in the disparate inclusion or exclusion.'" *Quinn v. Keinicke*, 700 A.2d 147, 156 (Del. Super. 1996) (alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

The strongest support for an implied prevailing party limitation comes from the commentary to various iterations of the Common Interest Act that refer to an award of expenses being available to a prevailing party. Unlike other jurisdictions, however, the General Assembly did not adopt the comments to the Uniform Act. *Cf.* Vt. Stat. Ann. tit. 27A, § 4-117 cmt. 1. And despite the absence of a prevailing party language in the text of the model provision, other states included prevailing party limitations in their versions of the Enforcement Provision.[19] The General Assembly did not.

The absence of prevailing party language indicates that the General Assembly did not intend to require that a party prevail within the meaning of *Buckhannon* before

---

[19] *See* Minn. Stat. § 515B.4-116(b) ("The court may award reasonable attorney's fees and costs of litigation to the prevailing party."); Nev. Rev. Stat. § 116.4117.6 ("The court may award reasonable attorney's fees to the prevailing party."); *see also* Colo. Rev. Stat. § 38-33.3-123(c) ("In any civil action to enforce or defend the provisions of this article or of the declaration, bylaws, articles, or rules and regulations, the court shall award reasonable attorney fees, costs, and costs of collection to the prevailing party."). When adopting the Condominium Act, Washington and Texas deviated from the model language by limiting expenses to a prevailing party. *See* Tex. Prop. Code Ann. § 82.161(b) (West 2019) ("The prevailing party in an action to enforce the declaration, bylaws, or rules is entitled to reasonable attorney's fees and costs of litigation from the nonprevailing party."); Wash. Rev. Code § 64.34.455 ("The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party."); *see also River Oaks Place Council of Co-Owners v. Daly*, 172 S.W.3d 314, 325–26 (Tex. App. 2005) (analyzing implications of prevailing party limitation); *Eagle Point Condo. Owners Ass'n v. Coy*, 9 P.3d 898, 904–09 (Wash. Ct. App. 2000) (same).

recovering expenses. The Enforcement Provision thus can accommodate a situation, like this case, in which the plaintiff obtains relief through voluntary action by the defendant in response to filed litigation. That outcome also accords with the consumer-friendly nature of the Common Interest Act and the statutory instruction that remedies under the DUCIOA should be "liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed." 25 *Del. C.* § 81-114. In this case, as the Association admits, Bragdon's lawsuit caused the Association to do "exactly what [he] asked the Court to compel Defendant to do." Dkt. 48 ¶ 5. Bragdon obtained this result only after incurring expenses, which he can recover in an "appropriate case." This decision already has held that this is an appropriate case.

### 6. The *Fisher* Decision

As its principal authority against an award of expenses, the Association relies on *Fisher v. Council of The Devon*, 1999 WL 1313661 (Del. Ch. Dec. 17, 1999). The *Fisher* case involved a different legal doctrine and different facts. It is a pre-DUCIOA ruling that does not interpret the Enforcement Provision and which relies on policy considerations that run contrary to the consumer-friendly underpinnings of the DUCIOA.

The plaintiff in the *Fisher* case was a condominium owner (Richard Fisher), who also was a member of the council that governed the community (The Devon). During a council meeting, Fisher argued against a contract to refurbish the building's lobby, but the council rejected his position by a vote of 4 to 1. The following month, Fisher filed a putative class action on behalf of all of the condominium owners against the four council members who approved the contract, claiming that under the declaration that governed the

47

community, any contract in excess of $10,000 required approval by a majority of the owners. Promptly after learning of the lawsuit, the council decided to hold a special meeting of owners to vote on the contract. At the special meeting, a majority of owners approved it. *Id.* at *1.

The vote rendered Fisher's claim moot. He then sought to recover his fees under the theory that "the litigation conferred a benefit on unit owners in the Devon, as a whole." *Id.* Fisher thus invoked the corporate benefit doctrine from corporate law. *Id.* at *2.

The court identified policy considerations that counseled against transplanting the corporate benefit doctrine wholesale into the context of a condominium. *See id.* at *2–3. The court explained that in a widely held corporation, fee awards incentivize monitoring behavior by otherwise rationally apathetic stockholders. *Id.* at *2. The court reasoned that condominium owners did not need similar incentives.

> Generally speaking, individual condominium owners have (1) a relatively large economic stake in the property, (2) easy means of communicating with their fellow unit owners and (3) simple and inexpensive ways to access and influence the decision-making body. Moreover, the agency relationship between unit owners and the decision-making body is quite different than in the case of widely held corporate enterprises. . . . The Council is merely a group of unitholders elected from time to time to govern those aspects of life at the Devon that require common decision-making. It functions more like a local government than a corporate board of directors. And, while unit owners may choose to adopt a passive role in relation to their governing structure, their passivity is not that of a small shareholder seeking a diversified portfolio of investments but, rather, that of a disinterested citizen.

*Id.* at *3.

Based on these factors, the court saw "less need for fee shifting arrangements" to encourage owners to sue and a greater need to encourage owners "to explore all available

means of resolving the dispute within the confines of the association and to seek 'political' solutions to disputes without resort to litigation." *Id.* The court also believed that, because an association likely would have limited resources to fund litigation, "the threat of paying even their own litigation costs will often be enough to cause managing bodies to take steps to moot a complaint by acquiescing in the demands of a plaintiff, even where valid grounds to litigate the dispute exist." *Id.*

Using this conceptual model,[20] the court held that the corporate benefit doctrine could apply to an association, but only if three additional elements were met. First, the plaintiff had to show that "the legal right involved is an important one" and "a clear entitlement to the relief sought." 1999 WL 1313661, at *3. Second, the plaintiff had to show that he or she "made substantial efforts to obtain the agreement of the governing body to the relief requested." *Id.* And third, the plaintiff had to show that he or she "made substantial efforts to secure the agreement of other unit owners to his or her position or their participation in the litigation." *Id.*

---

[20] The court's observations about how condominiums generally operate reflect a concept that scholars have referred to as "legislative facts," which are "the empirical assumptions about the world that courts necessarily make when deciding cases." *In re Appraisal of Dell Inc.*, 2015 WL 4313206, at *22 & n.18 (Del. Ch. July 13, 2015); *see In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 940 & n.59 (Del. Ch. 2003) (deploying concept and citing Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 402–03 (1942)). *See generally* Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 502–03 (2002) (describing concept at greater length). As discussed below, the DUCIOA rests on a different set of assumptions. For purposes of the DUCIOA, the General Assembly's legislative facts necessarily take precedence.

Applying this test to Fisher's claim, the court found that Fisher had sued over an issue that was relatively unimportant and that "nothing in the record" made the "plaintiff's position . . . particularly persuasive or clear." *Id.* at \*4. The court also could not conclude that Fisher made reasonable efforts to present his voting issue to the council. *Id.* The court noted that "[b]efore filing a lawsuit, it is not too much to expect that plaintiff and his counsel should have made a presentation to Council outlining the claim later alleged in the Complaint and the legal and factual basis for plaintiff's position." *Id.* And the court found that Fisher had not made sufficient efforts to secure the cooperation or agreement of other owners. Instead, Fisher "affirmatively acted on his own and represented to others that he was financing the litigation himself." *Id.* The court concluded that if Fisher had been able to assemble support from other owners, then "the lawsuit might have been averted altogether." *Id.* With Fisher having failed to meet any element of the court's test, the court denied the fee petition.

The *Fisher* decision reached a logical outcome under the corporate benefit doctrine, based on the facts of the case, and given the court's views about how condominiums like The Devon operated. But the *Fisher* decision is not persuasive authority for this case.

First, and most obviously, Bragdon is not seeking a fee award under the corporate benefit doctrine. Bragdon seeks an award of expenses under the Enforcement Provision, which the General Assembly enacted in 2008 when adopting the DUCIOA. The *Fisher* case, decided in 1999, did not implicate the DUCIOA. As with the bad-faith exception to the American Rule, it is not reasonable to believe that when enacting the Enforcement Provision, the General Assembly intended to codify only existing expense-shifting

50

principles. Such an interpretation would render the Enforcement Provision surplusage. The General Assembly instead created an independent basis for recovering expenses.

Second, this case presents different facts. Fisher filed a lawsuit challenging a decision that he lost as a council member. Fisher was not personally harmed by any action that the council was taking. He litigated a generalized governance issue. The council promptly agreed to hold a vote, and Fisher again lost on the merits. If the facts of *Fisher* were to arise under the Enforcement Provision, it would be relatively easy to conclude that an award should be denied.

Bragdon, by contrast, was targeted by the Association. He did not seek to litigate a generalized governance issue; he sought a remedy for an adverse action that he had suffered. Nor did Bragdon rush to litigate. He followed the internal dispute resolution procedures of the community by appealing the charges to the Board. Bragdon did not file this lawsuit until after the Board demonstrated that it would continue to act in an arbitrary and capricious manner by failing to adhere to its own determinations and by retroactively imposing additional, unwarranted charges.

Third, the General Assembly's adoption of the DUCIOA codifies a different set of expectations about how common interest communities operate. As discussed previously, the Common Interest Act is a consumer-protection statute. It contains provisions designed to address the concern that the board of an association may use its power to enforce rules, levy fines, and impose assessments in an overbearing and harmful manner. As courts in

51

other jurisdictions have noted, the authorization of expense shifting is designed to encourage owners to bring litigation to enforce restrictions on prohibited conduct.[21]

These problems are not theoretical. In Delaware, the Department of Justice has identified discriminatory enforcement as a widespread concern among owners in common interest communities. A report noted that "the most common and serious complaints received from owners" result from associations failing to comply with the bylaws, including by "discriminat[ing] against individuals," "harass[ing]" and "bully[ing]" individual owners, selectively enforcing assessments and fines, and "inconsistently appl[ying] standards for . . . architectural features." *See* Del. Dep't of Justice, *Common Interest Community Ombudsperson 2017-2018 Annual Report* 25–26.

Under the DUCIOA, the concern is not—as in *Fisher*—that owners will use litigation as a weapon against the association. The concern is rather that the board of the association will use its enforcement powers as a weapon against owners. To the extent that

---

[21] *See Levin & Stein*, 2010 WL 2910909, at *5 ("The Court concludes that this is an appropriate case for an award of attorneys' fees in favor of the Association. Such an award will promote the legislative purpose for enacting the fee provision, to encourage meritorious private enforcement actions. Moreover, the Association's action was a legitimate effort to enforce the [Condominium Act's] consumer protection provisions." (internal quotation marks omitted)); *see also Willow Springs Condo. Ass'n v. Seventh BRT Dev. Corp.*, 1996 WL 526901, at *2 (Conn. Super. Ct. Sept. 11, 1996) (explaining that expense-shifting provisions "create a climate in which private litigants help to enforce the ban on" the conduct barred by the relevant statute) (quoting *Associated Inv. Co. v. Williams Assocs. IV*, 645 A.2d 505, 511 (Conn. 1994)).

*Fisher* rested on different assumptions about how condominiums operate, the General Assembly's views prevail for purposes of the DUCIOA.[22]

*Fisher* is therefore inapposite. The decision did not involve the Enforcement Provision, it is factually distinguishable, and it rests on policy considerations that run contrary to the intent of the DUCIOA.

## E. The Amount Of The Expenses

Bragdon is entitled to an award of expenses. Under the Enforcement Provision, the award must be "reasonable." 25 *Del. C.* § 81-417(a). In his motion, Bragdon sought an award of $12,697.84, which reflects the amounts that Bragdon incurred before the Association mooted his underlying claims. *See* Dkt. 53 Ex. N. That amount is reasonable.

When evaluating the reasonableness of an attorneys' fee award, the Delaware Supreme Court has instructed the trial courts to consider the factors set forth in the Delaware Lawyers' Rules of Professional Conduct. *Mahani v. EDIX Media Gp., Inc.*, 935 A.2d 242, 245–46 (Del. 2007). The factors are

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)     the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar legal services;

---

[22] A general concern about boards acting oppressively towards owners does not rule out the possibility that in a particular case, an owner might be able to use litigation to harass or bully a board. If such conduct occurred, then the court could exercise its discretion under the Enforcement Provision to deny an award of expenses to the owner.

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent.

*Id.* at 246 (quoting Del. Lawyers' R. Prof'l Conduct 1.5(a)). The *Mahani* decision also instructed trial courts to consider "whether the number of hours devoted to litigation was excessive, redundant, duplicative or otherwise unnecessary." *Id.* at 247–48 (internal quotation marks omitted).

The parties have not analyzed the *Mahani* factors individually, likely because the amount Bragdon seeks is modest and facially reasonable. The requested award breaks down into $11,577.50 in attorneys' fees and $1,120.34 in costs, totaling $12,697.84. Dkt. 53 Ex. N. Bragdon's attorney charges $325 per hour, which is a plainly reasonable rate. Bragdon's paralegal charges at $125 per hour, which is also plainly reasonable. Assuming conservatively that all of the time was billed at the paralegal's rate, then Bragdon's team devoted ninety-three hours to the case. That amount of time is likewise plainly reasonable given the activities in which counsel engaged.

## III.     CONCLUSION

Under the Enforcement Provision, Bragdon is awarded expenses in the amount of $12,697.84. Within thirty days, the parties shall submit a form of final order that implements this result and brings this case to a close at the trial-court level.